Susan E. JOHNSON,
Plaintiff, Appellant,

v.

EDUCATIONAL TESTING SERVICE,
Defendant, Appellee.

No. 84–1597.

United States Court of Appeals,
First Circuit.

Argued Dec. 6, 1984.

Decided Jan. 31, 1985.

Jack R. Pirozzolo, Boston, Mass., with whom Mary Jeanne Tufano and Willcox, Pirozzolo & McCarthy, Boston, Mass., were on brief, for plaintiff, appellant.

George C. Caner, Jr., Boston, Mass., with whom Wayne H. Scott and Ropes & Gray, Boston, Mass., were on brief, for defendant, appellee.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and MALETZ,* Senior Judge.

MALETZ, Senior Judge.

Plaintiff-appellant Susan Johnson appeals from the district court's entry of summary judgment in favor of defendant-appellee Educational Testing Service, Inc. (ETS) and the court's denial of leave to amend her complaint. We affirm.

## I. *Background*

ETS is a non-profit corporation that prepares and administers the Law School Admission Test (LSAT). Susan Johnson, who was then a college senior, took the LSAT three times and achieved the following scores, on a scale of 200 to 800:

October 1970..... 317
December 1970... 323
April 1971 ....... 623

After ETS reported the 623 score to various law schools, the School of Law of the University of California at Berkeley (Berkeley) accepted Johnson for its fall class. On May 11, 1971, the University of Pennsylvania Law School, which had accepted Ms. Johnson in March, telephoned ETS to question the validity of the 623 score. ETS's Test Security Office then commenced an investigation, which included submission of the answer sheets and registration forms for all three tests to Jan Beck, a handwriting expert. Mr. Beck concluded that the April 1971 answer sheets and registration form were not written by the same person who wrote the first two answer sheets.

After reviewing the documents and Beck's opinion, ETS's Board of Review concluded that there was serious doubt about the validity of the 623 score and that Johnson should be so advised. Accordingly, on June 10, 1971, Louis Fowler, Secretary of the Board of Review and a member of the Test Security Office, wrote to Johnson advising her of the Board's doubts and offering her the following alternatives: (1) retaking the LSAT at no charge; (2) cancelling the 623 score; (3) submitting further information; or (4) doing nothing. Fowler said that ETS would cancel the 623 score if Johnson did nothing, or requested cancellation, or took the examination again but failed to "confirm" the score.

During the following weeks, ETS received further queries about the discrepancies in Johnson's LSAT scores from Berkeley and Columbia Law School. Ultimately, ETS consulted with two other handwriting experts, Ordway Hilton and Paul Osborn, who agreed with Beck's earlier conclusion that the April 1971 examination was not written by the same person who took the first two examinations. For her part, Johnson submitted her own affidavit and affidavits and letters by others to substantiate her claim that she was a person of good character; that she had taken all three examinations; and that the improvement in her score was made possible by, among other things, her receiving tutoring for the LSAT and taking medication to reduce anxiety.

ETS officials met with Johnson and her then attorney on August 5, 1971, and advised that ETS would require a retest to confirm her highest score. ETS proposed to give Johnson the same test that resulted in the 623 score and represented that the score would be confirmed if she came within fifty—or, depending on the circumstances, up to one hundred—points of 623. Johnson declined to take a retest on the ground that ETS could not duplicate her April 1971 "state of non-anxiousness." Later, Johnson presented a report by another handwriting expert, Elizabeth McCarthy,

---

*Of the United States Court of International Trade, sitting by designation.

who concluded that Johnson had written all the answer sheets.

On September 3, 1971, ETS's Board of Review decided to cancel the 623 score. Berkeley responded by revoking its acceptance of Johnson, but later admitted her on a provisional basis. On October 11, 1971, Berkeley informed ETS that in reliance on the opinion of yet another handwriting expert, Sherwood Morrill—who concluded that all three examinations were written by the same person—it would admit Johnson unconditionally.

Johnson commenced this diversity action in June 1972 and asserted five claims; one federal constitutional claim and four state law claims. She alleged that ETS: (1) arbitrarily invalidated the 623 score, thus denying her due process; (2) breached certain warranties; (3) breached its contract with her; (4) "wrongfully interfered with the advantageous contractual relationship" she had with Berkeley; and (5) defamed her. In January 1974, ETS moved for dismissal and summary judgment on all five counts of the complaint. In February 1974, Johnson filed opposition papers. The district court stayed discovery and, in May 1975, ordered the parties to submit statements of the material facts that, they contended, were or were not at issue. The parties filed such statements within the next several weeks. Thereafter, a period of almost nine years elapsed, during which the district court failed to rule on the pending motions.

Finally, in 1984, the action was reassigned to another district judge, who permitted each party to submit a supplemental memorandum of no more than twenty pages to reflect developments in the law since 1974. On June 8, 1984, the court, in an unpublished memorandum of decision, entered summary judgment for ETS on all counts and denied Johnson's "motion for leave to file a motion to amend the complaint." This appeal followed.

## II. *The Due Process Claim*

■ To succeed on her first claim, alleging a deprivation of due process, Johnson must show that ETS is a state actor and that its conduct was state action. This is because the Fourteenth Amendment "erects no shield against merely private conduct, however discriminatory or wrongful." *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). *Accord, e.g., Blum v. Yaretsky*, 457 U.S. 991, 1002, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982). In other words, the Fourteenth Amendment "applies to acts of the states, not to acts of private persons or entities." *Rendell-Baker v. Kohn*, 457 U.S. 830, 837, 102 S.Ct. 2764, 2769–70, 73 L.Ed.2d 418 (1982). Therefore, in reviewing constitutional claims, the Supreme Court has "insisted that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982).

■ The state action inquiry is two-fold: (1) whether "the deprivation [was] caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible," *id.*, and (2) whether "the party charged with the deprivation [was] a person who may fairly be said to be a state actor." *Id.* Since the test has two components, "not all actions by state actors are state action." *Gilmore v. Salt Lake Community Action Program*, 710 F.2d 632, 638 (10th Cir.1983). *See Lugar*, 457 U.S. at 935–36 n. 18, 102 S.Ct. at 2753–54 n. 18 (discussing *Polk County v. Dodson*, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981)).

Johnson contends that ETS is a state actor because the LSAT, which it administers, is a prerequisite to admission to nearly all law schools, many of which, including Berkeley, are state schools. Therefore, she argues, ETS exercises a virtual veto power over admission to law schools. She also points to ETS's contract with the Law School Admission Council, which provides that the Council (1) has ultimate responsibility for carrying out testing programs used for admission to law school and for the content of the tests and (2) determines general policy concerning conduct of the

program in consultation with ETS. Johnson further notes that approximately 45% of the Council's members, including Berkeley, are state schools. Moreover, she alleges that the ETS Board of Trustees included public officials and representatives of bodies that included public institutions.

■ Although Johnson's conception of state action was arguably tenable when her complaint was filed, the recent decisions in *Blum* and *Rendell-Baker* are fatal to her theory. *Cf. Cohen v. President of Harvard College*, 729 F.2d 59, 60 (1st Cir.) (per curiam) (commenting on devitalization of argument that Harvard, by accepting federal funds, became liable for violations of First and Fifth Amendments), *cert. denied*, —— U.S. ——, 105 S.Ct. 233, 83 L.Ed.2d 161 (1984).

In *Blum*, the Court held that private nursing homes did not engage in state action when they discharged or transferred Medicaid patients, even though the state subsidized the operating and capital costs of the facilities, paid medical expenses of more than 90% of the patients, and licensed the facilities. 457 U.S. at 1011, 102 S.Ct. at 2784. The Court reasoned:

> That the State responds to such [private discharge and transfer] actions by adjusting benefits does not render it *responsible* for those actions. The decisions about which respondents complain are made by physicians and nursing home administrators, all of whom are concededly private parties. There is no suggestion that those decisions were influenced in any degree by the State's obligation to adjust benefits in conformity with changes in the cost of medically necessary care.

*Id.* at 1005, 102 S.Ct. at 2786 (emphasis in original).

Similarly, in *Rendell-Baker*, the Court declined to find state action in the decision by a private school to discharge certain employees, notwithstanding that "virtually all of the school's income was derived from government funding." 457 U.S. at 840, 102 S.Ct. at 2771. The Court held that the significant presence of public funds was insufficient to comprise state action:

> The school, like the nursing homes [in *Blum*], is not fundamentally different from many private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government. Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts.

*Id.* at 840–41, 102 S.Ct. at 2771. *Accord Polk County v. Dodson*, 454 U.S. 312, 318–19, 102 S.Ct. 445, 449–50, 70 L.Ed.2d 509 (1981) (although state paid public defender, her relationship with her client was identical to that between any lawyer and client).

The principles of *Blum* and *Rendell-Baker* have been applied to the National Collegiate Athletic Association (NCAA), which "is a voluntary, unincorporated association of nearly one thousand four-year colleges and universities. Approximately one-half of its members are public institutions, state and federal." *Arlosoroff v. NCAA*, 746 F.2d 1019, 1020 (4th Cir.1984). Distinguishing earlier cases that had held the NCAA to be a state actor, the Fourth Circuit observed:

> These earlier cases rested upon the notion that indirect involvement of state governments could convert what otherwise would be considered private conduct into state action. That notion has now been rejected by the Supreme Court, however, and its decisions require a different conclusion.

*Id.* at 1021 (citing *Rendell-Baker* and *Blum*).

If anything, ETS is less a state actor than the NCAA. Whereas the NCAA is capable of disqualifying an athlete from intercollegiate competition, *id.* at 1020, ETS merely reports test scores and lacks authority to decide who shall be admitted and who shall be rejected. What is more, just as the regulation of college athletics is "not a function 'traditionally exclusively reserved to the state,'" *id.* at 1021 (quoting *Jackson v. Metropolitan Edison Co.*, 419

U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974)), the formulation, grading, and reporting of standardized tests is not an exclusive public function. *See Rendell-Baker*, 457 U.S. at 842, 102 S.Ct. at 2772 (education of maladjusted high school students, although a public function, is not exclusive prerogative of the state, even where private entity provides such education at public expense).

In *Arlosoroff*, there was no suggestion that public institutions belonging to the NCAA, as opposed to private institutions that were members, "caused or procured the adoption of the [disputed] Bylaw." 746 F.2d at 1021. Here, too, Johnson has not offered any proof that public institutions belonging to ETS took the lead in instigating the conduct she challenges.[1] In short, Johnson's due process claim cannot withstand the tests of *Blum* and *Rendell-Baker* and the district court correctly entered summary judgment for ETS on the claim.[2]

### III. *State Law Claims*

■ The last four of Johnson's claims are predicated on state contract and tort law. Although "the court must indulge all inferences favorable to the party opposing" a motion for summary judgment, *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976), and must "look at the record ... in the light most favorable to ... the party opposing the motion," *Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), "[t]he purpose of summary judgment is to go behind the pleadings and determine whether any further exploration of the facts is really necessary." *Packish v. McMurtrie*, 697 F.2d 23, 27 (1st Cir. 1983).

■ It is not enough for Johnson to rely on the allegations of her complaint, *id.*, in the absence of issues of fact that are "both 'genuine' and 'material.'" *Hahn*, 523 F.2d at 464. The principle was summarized in *Hahn* :

> A material issue is one which affects the outcome of the litigation. To be considered "genuine" for Rule 56 purposes a material issue must be established by "sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona v. Cities Service Co., Inc.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). The evidence manifesting the dispute must be "substantial", *Fireman's Mut. Ins. Co. v. Aponaug Mfg. Co., Inc.*, 149 F.2d 359, 362 (5th Cir.1945), going beyond the allegations of the complaint. *Beal v. Lindsay*, 468 F.2d 287, 291 (2d Cir.1972).

*Id.* Given these considerations, we find that the record discloses no genuine issues of material fact on Johnson's contract and tort claims and hence that those claims are resolvable by way of summary judgment.

### A. *Claims for Breach of Warranty and Breach of Contract*

Johnson alleges that ETS breached its warranties to her, because the LSAT was not what it purported to be—an accurate indicator of law school performance that could not be skewed by training or preparation. However, rather than alleging damage from the variation in her scores, Johnson asserted instead that her 623 score was cancelled in bad faith. This is the essence

---

**1.** *Cf. Rivas Tenorio v. Liga Atletica Interuniversitaria*, 554 F.2d 492, 495–96 (1st Cir.1977) (Commonwealth action found where Puerto Rican athletic association was dominated by Commonwealth instrumentalities and Commonwealth relinquished portion of governmental power to association).

**2.** This is not to say that ETS can never be a state actor engaging in state action. *Cf. Martin v. Educational Testing Serv.*, 179 N.J.Super. 317, 324 n. 7, 431 A.2d 868, 871 n. 7 (Ch.Div.1981)

(ETS concededly acted as agent of Commonwealth of Pennsylvania in administration of real estate license examination); *Golden Rule Life Ins. Co. v. Mathias*, 86 Ill.App.3d 323, 41 Ill.Dec. 888, 408 N.E.2d 310 (4th Dist.1980) (dismissal of complaint inappropriate where plaintiffs alleged that ETS designed examinations for licensure of insurance agents and brokers, graded examinations, determined who passed, and printed state licenses).

of her breach of contract claim. Therefore, the district court correctly concluded that her breach of warranty claim stated no claim independent of her breach of contract claim.

Johnson's breach of contract claim must be viewed against the background of the information bulletin distributed by ETS to all LSAT candidates, which stated in part:

> If doubts are raised about a candidate's scores after they have been reported, ETS will investigate the circumstances of the testing. Educational Testing Service reserves the right to cancel any test score, if in the opinion of ETS there is adequate reason to question its validity. Before exercising this right, ETS will offer the candidate a retest at no additional fee.

Accepting Johnson's contention that Massachusetts law—which the parties agree applies to the breach of contract claim—requires ETS to exercise its contractual rights reasonably and in good faith, *see Salem Glass Co. v. Joseph Rugo, Inc.*, 343 Mass. 103, 176 N.E.2d 30 (1961), summary judgment is still appropriate. As this court observed in a similar context, a plaintiff cannot force a trial by pointing to smoke but not fire, and "[h]ere we do not even see any smoke." *Packish*, 697 F.2d at 27.

■ It is not necessary to recount all the indicia of ETS's reasonableness and good faith. We think it sufficient to note that ETS sought the services of three separate handwriting experts after the University of Pennsylvania questioned the 300-point discrepancy in Johnson's scores; that ETS provided Johnson with an opportunity to be heard and to be represented by counsel; and that ETS offered Johnson, without charge, the option of a retest in which she would take the same April 1971 examination that resulted in the 623 score. These and other factors indicate that ETS went beyond the letter of its contractual promise. While Johnson "is entitled to all favorable inferences, [s]he is not entitled to build a case on the gossamer threads of whimsy, speculation and conjecture." *Manganaro*

*v. Delaval Separator Co.*, 309 F.2d 389, 393 (1st Cir.1962).

### B. *Interference with Contractual Relationship Claim*

■ The parties disagree over the choice of law on Johnson's claim that ETS intentionally interfered with her contractual rights by notifying Berkeley that the 623 score was invalidated. Johnson concedes, however, that the claim requires proof that ETS acted intentionally and without justification. *See Imperial Ice Co. v. Rossier*, 18 Cal.2d 33, 112 P.2d 631 (1941); *Bledsoe v. Watson*, 30 Cal.App.3d 105, 106 Cal.Rptr. 197 (1973). In light of our holding that summary judgment was appropriate on the breach of contract claim, there can be no doubt that ETS was entitled to summary judgment on the intentional interference claim, too. Since ETS acted in good faith, its actions can hardly be characterized as "without justification."

### C. *Defamation Claim*

For similar reasons, the district court was correct in granting ETS summary judgment on Johnson's defamation claim, which alleged damages by reason of "various oral and written communications [informing] persons and institutions, including the California School of Law [Berkeley], that the plaintiff's LSAT score of April 17, 1971 was invalid...." This being a diversity action, we must apply the substantive law of the states—California, Massachusetts, New York, and Pennsylvania—in which the allegedly defamatory material was published. *See Harkaway v. Boston Herald Traveler Corp.*, 418 F.2d 56, 58 (1st Cir.1969).

■ In the absence of bad faith, each of these states grants a qualified privilege to communications between those having a common interest in the substance of the communications, such as those between ETS and the law schools to which the scores were reported. *See Bollow v. Federal Reserve Bank of San Francisco*, 650 F.2d 1093, 1102 (9th Cir.1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662

(1982); *Williams v. Taylor*, 129 Cal.App.3d 745, 181 Cal.Rptr. 423 (1982); Cal.Civ.Code § 47(3) (West 1982); *Sheehan v. Tobin*, 326 Mass. 185, 93 N.E.2d 524 (1950); *Buckley v. Litman*, 57 N.Y.2d 516, 443 N.E.2d 469, 457 N.Y.S.2d 221 (1982); *Toker v. Pollak*, 44 N.Y.2d 211, 376 N.E.2d 163, 405 N.Y.S.2d 1 (1978); *Baird v. Dun & Bradstreet*, 446 Pa. 266, 285 A.2d 166 (1971); *Beckman v. Dunn*, 276 Pa.Super. 527, 419 A.2d 583 (1980).

▪ Here, as the district court pointed out, cancellation of the 623 score was not undertaken in bad faith. Therefore, ETS's communications to the law schools noticing the cancellation were protected by the qualified privilege. And other communications, since they were directed by ETS to Johnson and her agents, were not actionable. *See Burns v. Barry*, 353 Mass. 115, 228 N.E.2d 728 (1967). In these circumstances, summary judgment on the defamation claim was appropriate.

## D. *Intentional Infliction of Emotional Distress Claim*

The district court rejected Johnson's assertion, first made in 1984, that her complaint implicitly stated a claim for intentional infliction of emotional distress. To justify her delay in asserting the claim, Johnson points out that the Supreme Judicial Court of Massachusetts did not approve a claim for intentional infliction of emotional distress, in the absence of resulting bodily injury, until 1976, long after this action began. *See Agis v. Howard Johnson Co.*, 371 Mass. 140, 355 N.E.2d 315 (1976). But the possibility that such a claim would be approved was expressly acknowledged before this action was commenced, in *George v. Jordan Marsh Co.*, 359 Mass. 244, 255, 268 N.E.2d 915, 921 (1971), where the court approved a claim for intentional infliction of emotional distress when bodily injury was present.

▪ Johnson's unwillingness to take a path left open by *George* or, for more than seven years, to seek leave to amend her complaint in light of *Agis*, provide ample justification for the district court's finding that the complaint did not state a claim for intentional infliction of emotional distress. Moreover, against the background of our holding that ETS did not act in bad faith, the claim would have lacked merit even if seasonably and explicitly asserted. *See Agis*, 371 Mass. at 145, 355 N.E.2d at 319 (to succeed on claim for intentional infliction of emotional distress, plaintiff must show defendant's conduct to be "extreme and outrageous," "beyond all possible bounds of decency," and "utterly intolerable in a civilized community").

## IV. *Leave to Amend the Complaint*

▪ Johnson's final argument is that the district court erred in denying leave to amend the complaint so that she might advance claims based on contemporary legal precedents. Although leave to amend a pleading "shall be freely given when justice so requires," Fed.R.Civ.P. 15(a), the district court has discretion to deny leave to amend in the face of "extraordinarily long and essentially unexplained delay." *Carter v. Supermarkets Gen. Corp.*, 684 F.2d 187, 192 (1st Cir.1982). *Cf. Chitimacha Tribe of Louisiana v. Harry L. Laws Co.*, 690 F.2d 1157, 1163 (5th Cir.1982) ("Mere passage of time need not result in denial of leave to amend, but delay becomes fatal at some period of time."), *cert. denied*, ___ U.S. ___, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983).

▪ Although ETS's motion for summary judgment was left pending by the district court for a long period of time, and discovery was suspended, Johnson was always free to move for leave to amend her complaint. The district court acted reasonably in denying leave to amend the complaint after more than a dozen years had passed. Nor, despite Johnson's contention to the contrary, did the court abuse its discretion when, in 1984, it limited the parties to memoranda of twenty pages in supplementation of their 1974 memoranda on the motion for summary judgment.

### V. *Conclusion*

We have fully considered appellant's other arguments and find them to be without merit. The judgment of the district court is affirmed.

*Affirmed.*