87 N.Y.2d 384 (1995)
663 N.E.2d 289
639 N.Y.S.2d 977
Peter Dalton, as Parent and Natural Guardian of Brian M. Dalton, an Infant, Respondent,
v.
Educational Testing Service, Appellant.
Court of Appeals of the State of New York.
Argued October 19, 1995
Decided December 7, 1995.
White & Case, New York City (Philip H. Schaeffer, J. Stepan Wood and William R. Spiegelberger of counsel), and Wilmer, Cutler & Pickering (Bruce Berman and Michael F. Bennet, of the District of Columbia Bar, admitted pro hac vice, of counsel), for appellant.
Nicolosi & Sciacca, Bayside (Vincent F. Nicolosi and Laurie S. Hershey of counsel), for respondent.
Judges TITONE, BELLACOSA, SMITH and CIPARICK concur with Chief Judge KAYE; Judge LEVINE dissents and votes to reverse in a separate opinion in which Judge SIMONS concurs.
*386 Chief Judge KAYE.
The primary question before us is whether defendant, Educational Testing Service (ETS), a standardized testing firm, complied with procedures specified in its contract with high school senior Brian Dalton in refusing to release Dalton's Scholastic Aptitude Test (SAT) score. Because the factual findings underlying the trial court's determination that ETS failed to act in good faith in following those procedures were affirmed by the Appellate Division, have support in the record and are consequently beyond the scope of our review, we conclude  as did the trial court and Appellate Division  that ETS breached its contract with Dalton. Though we agree, moreover, with the *387 courts below that specific performance is the appropriate remedy, we nevertheless conclude that the promised performance was good-faith compliance with the stated procedures, not release of the questioned scores as ordered by those courts.

I
In May 1991, Brian Dalton took the SAT, which was administered by ETS, at Holy Cross High School in Queens where Dalton was a junior. Six months later, in November, he took the examination a second time, as a senior, this time at John Bowne High School in Queens, and his combined score increased 410 points.
Because Dalton's score increased by more than 350 points, his test results fell within the ETS category of "Large Score Differences" or "discrepant scores." In accordance with ETS policy, members of the ETS Test Security Office therefore reviewed his May and November answer sheets. Upon a finding of disparate handwriting, the answer sheets were submitted to a document examiner, who opined that they were completed by separate individuals. Dalton's case was then forwarded to the Board of Review, which preliminarily decided that substantial evidence supported cancelling Dalton's November score.
Upon registering for the November SAT, Dalton had signed a statement agreeing to the conditions in the New York State edition of the Registration Bulletin, which reserved to ETS "the right to cancel any test score * * * if ETS believes that there is reason to question the score's validity." The Registration Bulletin further provided that, if "the validity of a test score is questioned because it may have been obtained unfairly, ETS [will] notif[y] the test taker of the reasons for questioning the score" and offer the test-taker the following five options: (1) the opportunity to provide additional information, (2) confirmation of the score by taking a free retest, (3) authorization for ETS to cancel the score and refund all fees, (4) third-party review by any institution receiving the test score or (5) arbitration.
As specified in the Registration Bulletin, ETS apprised Dalton of its preliminary decision to cancel his November SAT score in a letter from Test Security Specialist Celeste M. Eppinger. Noting the handwriting disparity and the substantial difference between his May and November test results, Eppinger informed Dalton that "[t]he evidence suggests that *388 someone else may have completed your answer sheet and that the questioned scores may be invalid." She advised him that he could supply "any additional information that will help explain" this or, alternatively, elect one of the other options.
Eppinger enclosed the Procedures for Questioned Scores pamphlet with her letter, which reiterated the test-taker's right to "submit additional relevant information" to the Board of Review supporting the validity of questioned scores. In cautioning test-takers to provide only information "relevant to the questions being raised," the Procedures for Questioned Scores explained, "[f]or example, character references or testimonial letters do not explain handwriting differences." As to the four additional options, the guide further explained, "ETS also offers other options * * * if additional information doesn't resolve the questions about the validity of the scores. The option to provide additional information to resolve these questions may be used in combination with one or more of the[se] options."
Dalton opted to present additional information to the Board of Review, including the following: verification that he was suffering from mononucleosis during the May examination; diagnostic test results from a preparatory course he took prior to the November examination (he had taken no similar course prior to the May SAT) that were consistent with his performance on that test; a statement from an ETS proctor who remembered Dalton's presence during the November examination; and statements from two students  one previously unacquainted with Dalton  that he had been in the classroom during that test. Dalton further provided ETS with a report from a document examiner obtained by his family who concluded that Dalton was the author of both sets of answer sheets.
ETS, after several Board of Review meetings, submitted the various handwriting exemplars to a second document examiner who, like its first, opined that the May and November tests were not completed by the same individual. As a result, ETS continued to question the validity of Dalton's November score.
At this point plaintiff Peter Dalton, father and natural guardian of Brian Dalton, filed a CPLR article 78 proceeding, later converted to an action at law, to prohibit ETS from cancelling Dalton's November SAT score and to compel immediate release of the score. Following a 12-day nonjury trial, the trial court found that ETS failed "to make even rudimentary efforts to evaluate or investigate the information" furnished by *389 Dalton and thus concluded that ETS failed to act in good faith in determining the legitimacy of Dalton's score, thereby breaching its contract (155 Misc 2d 214, 225). The trial court premised this conclusion on its determination that the ETS Board of Review members failed to evaluate the information submitted because they believed Dalton's presence at the November SAT to be wholly irrelevant to the handwriting issue and that he could controvert the Board's preliminary finding that the score was invalid solely by taking a retest. As a remedy for the contractual breach, the trial court ordered ETS to release the November SAT score.
The Appellate Division affirmed. It too found that ETS ignored the documentation provided by Dalton and considered only the reports of its own document examiners. Like the trial court, the Appellate Division concluded that this failure to evaluate as well as to investigate Dalton's information constituted a breach of contract. In light of these factual determinations, we agree that ETS breached its contract with Dalton but differ as to the scope of the relief.

II
By accepting ETS' standardized form agreement when he registered for the November SAT, Dalton entered into a contract with ETS (see, AEB & Assocs. Design Group v Tonka Corp., 853 F Supp 724, 732). Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance (see, Van Valkenburgh, Nooger & Neville v Hayden Publ. Co., 30 N.Y.2d 34, 45, cert denied 409 US 875).
Encompassed within the implied obligation of each promisor to exercise good faith are "`any promises which a reasonable person in the position of the promisee would be justified in understanding were included'" (Rowe v Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 69, quoting 5 Williston, Contracts § 1293, at 3682 [rev ed 1937]). This embraces a pledge that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (Kirke La Shelle Co. v Armstrong Co., 263 N.Y. 79, 87). Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion (see, Tedeschi v Wagner Coll., 49 N.Y.2d 652, 659). The duty of good faith and fair dealing, however, is not without limits, and no obligation can be implied that "would be inconsistent with other terms of the contractual relationship" (Murphy v American Home Prods. Corp., 58 N.Y.2d 293, 304).
*390 The parties here agreed to the provisions in the Registration Bulletin, which expressly permit cancellation of a test score so long as ETS found "reason to question" its validity after offering the test-taker the five specified options. Nothing in the contract compelled ETS to prove that the test-taker cheated. Nor did the invitation to the test-taker to furnish ETS with relevant information reasonably and realistically translate into any requirement that ETS conduct a field investigation or gather evidence to verify or counter the test-taker's documentation. Indeed, such an obligation would be inconsistent with the contractual language placing the burden squarely on the test-taker to overcome the ETS finding of score invalidity. ETS, therefore, was under no duty, express or implied, to initiate an external investigation into a questioned score.
The contract, however, did require that ETS consider any relevant material that Dalton supplied to the Board of Review. The Registration Bulletin explicitly afforded Dalton the option to provide ETS with relevant information upon notification that ETS questioned the legitimacy of his test score. Having elected to offer this option, it was certainly reasonable to expect that ETS would, at the very least, consider any relevant material submitted in reaching its final decision.
Dalton triggered this implied-in-law obligation on the part of ETS by exercising his contractual option to provide ETS with information (compare, Matter of Yaeger v Educational Testing Serv., 158 AD2d 602 [where test-taker declined to invoke any of the proffered options, ETS cancelled score in good faith and in accordance with terms of the contract]). Significantly, Dalton heeded the advice in the Procedures for Questioned Scores and tendered numerous documents that did more than simply deny allegations of wrongdoing or attest to his good character, such as medical evidence regarding his physical condition, statements by fellow test-takers, the statement of a classroom proctor and consistent diagnostic test results (compare, Swencki v Educational Testing Serv., No. C 81-0689 [WD KY] [test-taker sent letter to ETS explaining that he could not have cheated]; Matter of K. D. v Educational Testing Serv., 87 Misc 2d 657 [test-taker submitted sworn statement that he did not cheat]).
Nevertheless, with the exception of the document examiner's report, ETS disputes the relevancy of this information. Specifically, ETS maintains that the sole issue before the Board of Review was the disparate handwriting and that evidence regarding Dalton's health (apart from a damaged arm) or presence during both examinations is irrelevant to resolving that issue.
*391 To be sure, the Procedures for Questioned Scores warned Dalton "to provide only additional information that is relevant to the questions being raised." The Eppinger letter to Dalton, however, informed him that his November score was possibly invalid precisely because ETS believed "that someone else may have completed [his] answer sheet." Thus, ETS expressly framed the dispositive question as one of suspected impersonation. Because the statements from the classroom proctor and November test-takers corroborated Dalton's contention that he was present at and in fact took the November examination, they were relevant to this issue.
Likewise, inasmuch as the medical documentation concerning Dalton's health at the time of the May SAT provided an explanation for his poor performance on that examination, and the consistent diagnostic test results demonstrated his ability to achieve such a dramatic score increase, these items were also germane to the question whether it was Dalton or an imposter who completed the November examination. Indeed, in its manual, Policies and Procedures Concerning Scores of Questionable Validity  which details internal ETS procedure regarding questioned scores  ETS offers several examples of "relevant information" that a test-taker might provide, including "a doctor's report that the candidate was under the influence of medication at the time the low score was earned." Regarding "a case of possible impersonation" in particular, the manual suggests that "other test results might demonstrate that the questioned score is not inconsistent with other measures of the candidate's abilities." Thus, Dalton's material fell within ETS' own definition of relevancy, as expressed in its manual and letter to Dalton.
The critical question then is whether the Board of Review made any effort to consider this relevant information submitted by Dalton. That is a factual inquiry. Both the trial court and the Appellate Division concluded that the Board utterly failed to evaluate the material. Given these affirmed findings, "our scope of review is narrow. This Court is without power to review findings of fact if such findings are supported by evidence in the record" (Humphrey v State of New York, 60 N.Y.2d 742, 743).
Several Board of Review members  each member alone had the power to order release of Dalton's November score  testified that they believed information establishing Dalton's presence during the November examination to be irrelevant to *392 their determination[*] and, moreover, that only a successful retest would validate Dalton's score. Thus, there is support in the record for the factual determinations of the trial court and Appellate Division and they are binding on us. This is so notwithstanding inconsistent testimony by Board members that the Board did review Dalton's information but found it unpersuasive. In light of the affirmed findings, the Court of Appeals simply does not have authority to weigh conflicting evidence and make its own factual determinations, as the dissent would do.
Consequently, this case is factually distinct from those relied upon by ETS, where the testing service considered but then rejected information provided by the test-taker (see, e.g., Langston v ACT, 890 F.2d 380; Denburg v Educational Testing Serv., No. C-1715-83 [NJ Super Ct]; cf., Johnson v Educational Testing Serv., 754 F.2d 20, 26, cert denied 472 US 1029 [noting that ETS provided test-taker with opportunity to be heard and to be represented by counsel]). When ETS fulfills its contractual obligation to consider relevant material provided by the test-taker and otherwise acts in good faith, the testing service  not the courts  must be the final arbiter of both the appropriate weight to accord that material and the validity of the test score. This Court will not interfere with that discretionary determination unless it is performed arbitrarily or irrationally.
Where, however, ETS refuses to exercise its discretion in the first instance by declining even to consider relevant material submitted by the test-taker, the legal question is whether this refusal breached an express or implied term of the contract, not whether it was arbitrary or irrational. Here, the courts below agreed that ETS did not consider the relevant information *393 furnished by Dalton. By doing so, ETS failed to comply in good faith with its own test security procedures, thereby breaching its contract with Dalton.
The dissent urges that because the trial court and Appellate Division relied in part on ETS' failure to investigate Dalton's information, they arguably employed an erroneous legal standard. Overlooked, however, is that both courts also concluded that ETS' refusal to evaluate the material breached the contract with Dalton and, thus, employed a correct legal standard. Moreover, the crucial factual inquiry under the correct standard  whether ETS considered Dalton's relevant material  has already been resolved by those courts. Because this factual finding dictates the legal conclusion that ETS breached the contract, remittal is unnecessary.

III
We agree with the trial court and Appellate Division that Dalton is entitled to specific performance of the contract. Dalton is not, however, entitled to release of his score as though fully validated. The goal of specific performance is to produce "as nearly as is practicable, the same effect as if the contract had been performed" (Farnsworth, Contracts § 12.5, at 823 [1982]). Had the contract here been performed, ETS would have considered the information provided by Dalton in reaching a final decision. ETS never promised to release a score believed to be invalid, and the validity of Dalton's November SAT score has yet to be determined. Indeed, the trial court specifically noted that it was not resolving the question whether Dalton in fact took the November test.
In an analogous context, we have refused to compel a university to issue a degree to a student who had not fulfilled the academic requirements (see, Matter of Olsson v Board of Higher Educ., 49 N.Y.2d 408). This reluctance to interfere with the exercise of academic discretion is motivated by sound considerations of public policy. "When an educational institution issues a diploma to one of its students, it is, in effect, certifying to society that the student possesses all of the knowledge and skills that are required by his [or her] chosen discipline" (id., at 413). Likewise, we have held that a college did not act arbitrarily in declining to "round off" a student's failing grade so that she could graduate (see, Matter of McIntosh v Borough of Manhattan Community Coll., 78 AD2d 839, affd 55 N.Y.2d 913).
The comparison between ETS and academic institutions is surely not exact, inasmuch as judicial restraint in matters of *394 academic achievement is based, in part, on the inherently subjective nature of the evaluation to be made by professional educators (see, Tedeschi v Wagner Coll., 49 N.Y.2d 652, 658, supra). Still, similar policy concerns militate against directing ETS to release a questioned score. When a standardized testing service reports a score, it certifies to the world that the test-taker possesses the requisite knowledge and skills to achieve the particular score. Like academic credentials, if courts were to require testing services to release questioned scores, "the value of these credentials from the point of view of society would be seriously undermined" (Olsson, supra, at 413). Given the reliance that students, educational institutions, prospective employers and others place on the legitimacy of scores released by ETS, requiring challenged scores to be reported would be contrary to the public interest and exceed the scope of ETS' promised performance.
While courts as a matter of policy are reluctant to intrude upon academic discretion in educational matters, they stand ready as a matter of law and equity to enforce contract rights. Where a contract is breached, moreover, and the injured party is entitled to specific performance, the remedy must be a real one, not an exercise in futility.
Dalton is entitled to relief that comports with ETS' contractual promise  good-faith consideration of the material he submitted to ETS. We cannot agree with Dalton's assumption that ETS will merely rubber-stamp its prior determination without good-faith attention to his documentation and that reconsideration by ETS will be an empty exercise. Our conclusion that the contract affords Dalton a meaningful remedy rests also on the provision in the Procedures for Questioned Scores allowing Dalton to utilize one or more of the remaining four options in combination with renewed consideration by the Board of Review. Those options  including third-party review by any institution receiving the test score as well as arbitration  remain available should ETS determine that the information submitted fails to resolve its concerns about the validity of the November score.
Accordingly, the Appellate Division order should be modified in accordance with this opinion and, as so modified, affirmed, without costs.
LEVINE, J. (dissenting).
I agree with the majority that the Educational Testing Service (ETS) had no duty, express or implied, to investigate the information submitted by Brian *395 Dalton. However, I do not agree that we are bound by the factual determinations of the lower courts, which are based on an erroneous legal standard, or that the record contains any evidence that ETS arbitrarily failed to consider the materials submitted by Dalton. I, therefore, respectfully dissent.
A primary obligation of ETS as administrator of the SAT and other scholastic aptitude tests heavily relied upon by institutions of higher education is to certify that released scores accurately reflect the performance on the test of the identified test taker. The college admission process is highly dependent on the authenticity of the SAT scores released by ETS, as are other test takers whose scores are valued in relation to those of all others who take the exam and are competing for admission. In order to ensure the reliability of its certification process, ETS has established elaborate procedures that balance the harms to institutions and other candidates of the release of possibly invalid scores against the detriment to students whose scores are challenged as potentially invalid. The procedures established by ETS are unquestionably fair; they give test takers whose scores are questioned opportunity after opportunity to validate their scores. In the end, however, ETS as a practical necessity must be the final arbiter of whether it can honestly certify the validity of a student's score. Thus, the standard contract between ETS and test takers reserves to ETS the right "to cancel any test score * * * if ETS believes that there is reason to question the score's validity [emphasis supplied]."
Peter Dalton, Brian Dalton's father, brought this suit based on the claim that ETS treated Brian Dalton unfairly because it did not conduct a thorough investigation of the material Brian submitted to ETS when his scores were questioned. The trial court accepted Dalton's argument.[*] Thus, to support its conclusion that ETS failed "to make even rudimentary efforts to evaluate or investigate the information furnished by" Dalton and thus failed to act in good faith in carrying out its obligations to Dalton, the court pointed to ETS's failure to make contact with or question the proctor, the test administrator, or other students who gave evidence that tended to show that Dalton was present, and to ETS's refusal to conduct fingerprint *396 or lie detector tests on Dalton (155 Misc 2d 214, 225). Likewise, the Appellate Division clearly considered ETS's failure to investigate as a factor in its ultimate conclusion that ETS acted without good faith: "The practice of ignoring Dalton's evidence without even initiating a preliminary investigation clearly demonstrate a lack of good faith by ETS" (206 AD2d 402, 403 [emphasis supplied]).
My colleagues in the majority here, however, correctly conclude that ETS had no express or implied duty to investigate. Thus, it seems indisputable that the ultimate determinations of the courts below  that ETS breached its implied covenant of good faith and fair dealing  were reached at least in significant part by reliance on an erroneous legal standard, that ETS had a duty to investigate. Thus, at a minimum, reversal and remittal for new findings based on the proper legal standard is required here.
However, applying the correct legal standard to the record evidence, it is my conclusion that ETS fulfilled its contractual obligations as a matter of law and, therefore, we should reverse and dismiss the Daltons' complaint.
As the Chief Judge concludes, ETS was contractually obligated to consider any relevant material that Dalton supplied the Board of Review (majority opn, at 390). After considering that evidence, ETS had the stated right to cancel Dalton's test score if it possessed "a reason to question" the score's validity. Thus, it seems self-evident that ETS expressly reserved to itself substantial discretion on whether to refuse to certify a test score.
To be sure, there is a covenant of good faith and fair dealing implicit in the contract between Dalton and ETS (see, Rowe v Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 68; Van Valkenburgh, Nooger & Neville v Hayden Publ. Co., 30 N.Y.2d 34, 45, cert denied 409 US 875). It requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (Kirke La Shelle Co. v Armstrong Co., 263 N.Y. 79, 87). In this way, the implied covenant "is in aid and furtherance of other terms of the agreement of the parties. No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship" (Murphy v American Home Prods. Corp., 58 N.Y.2d 293, 304 [rejecting application of implied covenant to at-will employment contracts]). Where good faith is an express condition of a contract that contemplates a wide scope of discretion on the part of one party, there *397 is no breach if the discretionary act performed is "not arbitrary and capricious" (Smith v Robson, 148 N.Y. 252, 255; see also, 3A Corbin, Contracts § 647, at 104-106). The implied covenant does no more; it works only to ensure that a party with whom discretion is vested does not act arbitrarily or irrationally (see, e.g., Tedeschi v Wagner Coll., 49 N.Y.2d 652, 659).
Thus, the issue here is whether there is evidence that ETS performed its discretionary functions arbitrarily or irrationally, or with bad faith in fact (cf., Langston v ACT, 890 F.2d 380, 386; Johnson v Educational Testing Serv., 754 F.2d 20, cert denied 472 US 1029 [American College Testing Program only contractually required to act in good faith]).
Here, there was no evidence of bad faith in fact. Moreover, ETS had two definitive reports of highly qualified handwriting experts, of proven reliability, that the November 1991 answer sheet was filled out by someone other than the person who filled out the May 1991 exam answer sheet and the documents known to have been signed or produced by Brian Dalton. Surely it was not irrational or arbitrary for ETS to find that the unexplained disparate handwriting on the November 1991 answer sheet gave it reason to question the validity of the second test score. The courts below did not find otherwise. Nor can it be said that, as a matter of law, the evidence submitted by Dalton totally obviated the reasons ETS had to question the test score. It was, therefore, not a breach of the implied covenant of good faith to refuse to certify Dalton's scores after consideration of the evidence submitted, and the majority does not so hold.
Rather the majority holds that there is evidence that ETS breached its implied covenant of good faith in its deliberative process in failing "to consider" Dalton's submissions (majority opn, at 391). However, the uncontroverted evidence accepted by the courts below and the majority here is that when ETS received the information submitted by Dalton it did not totally disregard it. Rather, it considered it and judged it weighty enough to merit further evaluation. Thus, it is undeniable that ETS responded to the submissions by retaining another handwriting expert to get a third evaluation of the documents. In addition, ETS submitted Dalton's additional handwriting samples to its first handwriting expert for a second evaluation.
To overcome this concrete evidence of consideration, the majority points to selectively narrow portions of the record in which ETS Board of Review members testified that they deemed irrelevant Dalton's evidence that tended to show he *398 was in the room on the day the test was given as evidence that ETS "failed to consider" Dalton's submissions, which in turn supported the determination of its breach of the implied covenant of good faith and fair dealing. I disagree.
Again, it is uncontroverted that each member of the ETS Board of Review gave a reason why he or she found Dalton's submissions irrelevant. Therefore, a breach of the implied covenant of good faith and fair dealing could only be established if the reason the Board members gave to deem irrelevant Dalton's submissions was arbitrary, capricious or irrational. Each Board member testified that the evidence did not explain their one lingering crucial doubt, the disparate handwriting, which was the exact doubt communicated to Dalton by ETS  "someone else may have completed [the] answer sheet" (Dec. 11, 1991 letter to Brian Dalton). Because the reason to deem irrelevant Dalton's evidence of presence was not irrational, arbitrary or capricious it cannot, as a matter of law, form the basis of a breach of the implied covenant of good faith. It is only by substituting its judgment for that of ETS as to what should have been deemed relevant evidence that the majority finds evidence of bad faith. However, "[w]hen an [institutional decision maker] * * * acts within its jurisdiction, not arbitrarily but in the exercise of an honest discretion based on facts within its knowledge that justify the exercise of discretion, a court may not review the exercise of its discretion" (Matter of Carr v St. John's Univ., 17 AD2d 632, 634, affd 12 N.Y.2d 802; see also, Matter of Harris v Trustees of Columbia Univ., 98 AD2d 58, 70 [Kassal, J., dissenting], revd on dissenting opn below 62 N.Y.2d 956).
In sum, ETS acted within its discretion in continuing the security process rather than releasing the score after considering and rejecting Dalton's evidence. There is no evidence that ETS acted arbitrarily in its discretionary decision-making process. Hence there is no evidence that ETS breached any express or implied covenant in its contract with Dalton. Accordingly, I would reverse the order of the Appellate Division and dismiss the complaint.
Order modified in accordance with the opinion herein and, as so modified, affirmed, without costs.
NOTES
[*] For example, when Shirley Kane-Orr  chairperson of the Board of Review and a member of the three-member panel of the Board that initially reviewed Dalton's case on December 11, 1991, the panel that again considered his case on January 3d, 1992, and the final panel to review Dalton's case on February 7, 1992  was asked whether she "or any member of the panel or the test security office ever question[ed] [Dalton's] presence in the classroom," she answered, "[n]o"; when further asked by Dalton's counsel, "[s]o am I to assume * * * that since you didn't question his presence in the classroom, that it was not an issue in this case," she responded, "[i]t was a non-issue in the sense that [it] was not an issue at all to be considered whether or not he was in the classroom." Likewise, Sydell Carlton, member of the panel that considered Dalton's case on January 17, 1992, was also asked whether she ever questioned Dalton's presence in the classroom, to which she replied, "[t]hat was not an issue for us to decide. The issue for us to decide was, why are those handwritings disparate? His presence in the room was not, for us, in issue."
[*] Notably, Dalton's scores had not been finally cancelled at the inception of this suit. Dalton had been offered, but refused, the opportunity to validate his scores by taking another test at the expense of ETS and scoring within a specified range of his November score, or to submit the matter to arbitration.