252 N.J. Super. 610 (1991)
600 A.2d 500
EILEEN SCOTT, PLAINTIFF-RESPONDENT,
v.
EDUCATIONAL TESTING SERVICE, DEFENDANT-APPELLANT, AND AMERICAN ARBITRATION ASSOCIATION AND ALLAN MARAIN, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 30, 1991.
Decided December 30, 1991.
*611 Before Judges GAULKIN, MUIR, Jr. and LANDAU.
Howard P. Willens, of the District of Columbia Bar, argued the cause for appellant (Wilmer, Cutler & Pickering, of the District of Columbia Bar, and McCarter & English, attorneys; Howard P. Willens, John L. McGoldrick and Stanford von Mayrhauser, of counsel; Howard P. Willens, B. John Pendleton, Jr. and Penelope M. Taylor, on the brief).
*612 Jill L. McNish argued the cause for respondent (Gelman & McNish, attorneys).
The opinion of the court was delivered by GAULKIN, P.J.A.D.
Plaintiff, a temporary teacher in the New York City public schools, obtained passing scores on all three parts of the National Teachers Examination (NTE), administered by defendant Educational Testing Service (ETS). ETS conducted a review of the scores and concluded that, as to two of the three parts of the test, "copying or communication with another test taker may have occurred and ... the questioned scores may be invalid." ETS offered plaintiff various options to resolve the question, including arbitration. Plaintiff chose arbitration and the arbitrator ruled that ETS could cancel plaintiff's scores.
Plaintiff then filed this action to vacate that award and for other relief. Finding that ETS had violated plaintiff's rights to procedural due process, the trial judge vacated the award and ordered that a "new in-person oral arbitration" be conducted in which ETS would have the burden of establishing that plaintiff had in fact cheated. We reverse.

I
Plaintiff had taken all three parts of the examination  Communication Skills, Professional Knowledge and General Knowledge  in March 1989, but passed only Communication Skills. She retook the other two parts in June 1989, this time passing Professional Knowledge but failing General Knowledge. She again failed the General Knowledge test in October 1989. After receiving some tutoring, she took the General Knowledge test for a fourth time in March 1990 and passed with a score of 679, 42 points higher than her October 1989 score. That difference prompted ETS to investigate the validity of the most recent score.
*613 As described by ETS, its review took into consideration the fact that only three test takers out of a sample of over 7,000 recorded gains of more than 42 points in the General Knowledge test; that plaintiff's March 1990 General Knowledge answer sheet "revealed unusual agreement of correct and incorrect responses linking [her] answer sheet with that of another test taker, who will be called B"; that plaintiff's March 1989 Communication Skills answer sheet also revealed an "unusual agreement of correct and incorrect responses linking [her] answer sheet with that of another test taker, who will be called C"; and that her June 1989 Professional Knowledge answer sheet revealed no such agreement with that of any other test taker. In its analysis of the answer sheets, ETS found that
[plaintiff's] agreement with 18 or more of B's 19 incorrect responses is expected less than once in comparing B's answer sheet with 100,000,000 answer sheets completed independently by test takers performing at [plaintiff's] score level.... [Plaintiff's] agreement with 10 or more of C's 12 incorrect responses is expected slightly more than four times in comparing C's answer sheet with 10,000,000 answer sheets completed independently by test takers performing at [plaintiff's] score level.
ETS thus concluded that it had "substantial evidence supporting cancelation" of plaintiff's March 1990 General Knowledge and the March 1989 Communication Skills scores. ETS invited plaintiff to "provide us with any additional information that will help explain" its findings and offered these "other options for resolving this matter":
 take the tests again at a specially arranged administration, at our expense, to confirm the validity of your scores.
 ask ETS to cancel the scores and ETS will refund all test fees involved.
In addition, you can request third-party review of this matter by:
 canceling the questioned scores and asking any college, university or agency to which you are applying to review the information considered by ETS and make an independent decision about accepting the scores; or
 asking that a member of the American Arbitration Association be appointed to arbitrate the matter independently.
In its letter, ETS noted that it was enclosing a pamphlet explaining those options and "acknowledg[ing] your right to seek judicial review"; it also stated that "[i]f this matter is not *614 cleared up by further information or if you do not choose one of the available options, ETS will have to cancel your scores."
Through counsel, plaintiff advised that she wanted to challenge ETS's findings and conclusions in arbitration. ETS submitted to plaintiff a form agreement providing for arbitration in accordance with American Arbitration Association (AAA) Commercial Arbitration Rules, subject to certain conditions including:
1. The only question for the arbitrator is whether there is substantial evidence supporting cancelation of the scores in question based on the information available to ETS. The decision of the arbitrator will be final and binding.
2. Because arbitration is provided as an independent review of the Board of Review action based only on the information available to ETS including information submitted on my behalf, the arbitrator will have no authority to subpoena witnesses or evidence or to otherwise require the parties to present witnesses or evidence.
* * * * * * * *
5. In supporting my position in the arbitration, I will not introduce information that was not made available to ETS when the Board of Review decided my case. (In supporting its position in the arbitration, ETS may introduce only information that was available to it when the Board of Review decided my case.) However, I may assert and ETS may assert any analysis, interpretation or argument based on or derived from information that is properly introduced by me or ETS in the arbitration.
* * * * * * * *
8. Ordinarily, the arbitrator's decision will be based upon the written material submitted. The arbitrator may grant requests for personal hearings but only if there are compelling reasons to do so. Both parties will be invited to any personal hearings and each side will pay its own expenses in attending such hearings.
* * * * * * * *
10. If the arbitrator finds that there is substantial evidence supporting cancelation based on the information available to ETS, then ETS will cancel my scores without informing anyone else of the reasons for doing so.
After plaintiff and ETS executed the agreement, her attorney asked the AAA for "an in-person hearing." His client, he explained, "is being accused of cheating" and did not want to "be relegated to a statement merely attesting to her innocence." Moreover, he urged that "non-statistical evidence such as seating charts, and proctors' observations or the lack thereof, *615 are also relevant considerations ... in the factual determination of this matter." The arbitrator denied the request for an oral hearing and directed the parties to submit any material they wanted him to consider. After both parties made written submissions, the arbitrator held that ETS had "a substantial basis to question the validity of the scores ... and may cancel same."
Plaintiff then filed this action. The First Count of her complaint sought the vacation of the arbitration award pursuant to N.J.S.A. 2A:24-8c and d, alleging that the arbitrator "fail[ed] to make a finding as to whether plaintiff had in fact cheated, as distinguished from whether ETS had a `substantial basis to question' the scores" and had "refused to hear the evidence in support of plaintiff's case  i.e., that she did not cheat." The Second Count demanded vacation of the award and damages because ETS's actions were "arbitrary, capricious and unconscionable" and the procedures "dictated by ETS and adhered to by [AAA] ... did not comply with due process"; the Third Count asserted a claim for damages under 42 U.S.C. § 1983 et seq.; the Fourth Count claimed damages for ETS's "intentional, wrongful and outrageous" conduct in questioning her scores "without any concern about plaintiff's actual guilt or innocence." An order issued requiring ETS to show cause why the arbitration award should not be vacated and the test scores reinstated and reported.
On the return of the order to show cause, the motion judge held that ETS was obligated to afford plaintiff due process because it was "acting as an agent of New York City and the New York licensing authority." He found that the arbitrator "conducted the arbitration pursuant to the procedures set forth in the arbitration agreement," but that
limiting the arbitration option to a determination as to whether there was substantial evidence supporting cancellation and limiting the review to information available to defendant when the cancellation decision was made is arbitrary and unreasonable and a violation of plaintiff's due process rights.
* * * * * * * *

*616 The arbitration option should have provided for a determination as to whether plaintiff engaged in misconduct since that is in reality the reason [ETS] believed it had to question the validity of her score.
The judge concluded that the ETS procedures for questioning scores and the arbitration agreement itself were "unenforceable contracts of adhesion" because they "unreasonably denied plaintiff her due process right to contest the real reason for cancelling her scores, namely, alleged misconduct." Although the proofs relied on by ETS constituted "strong prima facie evidence of misconduct," plaintiff was entitled "to offer evidence to the arbitrator to rebut misconduct." Accordingly, the judge ordered that the arbitration award be vacated and that plaintiff be allowed "to exercise the arbitration option she already chose, but this time in the expanded form described above." On motion of ETS, we granted leave to appeal and stayed the order.

II
The procedural history strongly suggests that plaintiff waived her due process claim by agreeing to an arbitration limited to the inquiry "whether there is substantial evidence supporting cancelation of the scores." Plaintiff was not compelled to arbitrate and indeed had been advised by ETS that she could bring her challenge in court. When she chose arbitration she bound herself by the arbitration agreement, including its terms as to the scope of the arbitrator's authority and the procedures to be employed. See, e.g., Cohen v. Allstate Ins. Co., 231 N.J. Super. 97, 555 A.2d 21 (App.Div.), certif. denied, 117 N.J. 87, 563 A.2d 846 (1989). A claimant who elects arbitration and proceeds to an unfavorable award normally cannot have recourse to the court for a second bite at the apple. See Highgate Dev. Corp. v. Kirsh, 224 N.J. Super. 328, 540 A.2d 861 (App.Div. 1988). However, neither in the trial court nor before us has ETS argued that plaintiff waived her right to a judicial determination of her due process claim. Accordingly, and in light of the fact that the claim is of constitutional *617 dimension, we shall pass the procedural questions and address the merits. Cf. Alexander v. Gardner  Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (employee's unsuccessful arbitration of his racial discrimination claim did not bar him from proceeding in the federal court under Title VII of the Civil Rights Act of 1964); Thornton v. Potamkin Chevrolet, 94 N.J. 1, 462 A.2d 133 (1983) (employee's unsuccessful arbitration of his wrongful layoff claim did not foreclose him from pursuing administrative remedies for discrimination under the New Jersey Law Against Discrimination).
To reach the due process issue, we will also assume, without deciding, that ETS's conduct was "state action" subject to the due process clause of the Fourteenth Amendment. See, generally, NCAA v. Tarkanian, 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988); Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). We note, however, that the facts bearing on the presence or absence of state action were not thoroughly exposed in the trial court. The cases which have considered, on particular facts and with variant results, whether national testing organizations are engaged in state action are thus not determinative here. See Martin v. Educational Testing Serv., Inc., 179 N.J. Super. 317, 431 A.2d 868 (Ch.Div. 1981); Langston v. ACT, 890 F.2d 380 (11th Cir.1989); Johnson v. Educational Testing Serv., 754 F.2d 20 (1st Cir.1985), cert. denied, 472 U.S. 1029, 105 S.Ct. 3504, 87 L.Ed.2d 635 (1985); Stewart v. Hannon, 469 F. Supp. 1142 (N.D.Ill. 1979); Yaeger v. Educational Testing Serv., 158 A.D.2d 602, 551 N.Y.S.2d 574 (1990); Golden Rule Life Ins. Co. v. Mathias, 86 Ill. App.3d 323, 41 Ill.Dec. 888, 408 N.E.2d 310 (1980); K.D. v. Educational Testing Serv., 87 Misc.2d 657, 386 N.Y.S.2d 747 (Sup.Ct. 1976).

III
Plaintiff's essential contention is that due process requires that ETS certify her scores unless it can prove, at an *618 evidentiary hearing, that she cheated: since her licensure as a teacher is dependent on her passing the NTE, ETS should not be permitted to cancel her scores solely upon a finding of "substantial evidence" to question their validity. We reject that argument.
State actors must afford due process to persons seeking admission to a profession or occupation. See Schware v. Bd. of Bar Examiners, 353 U.S. 232, 238-39, 77 S.Ct. 752, 755-56, 1 L.Ed.2d 796, 801 (1957). But due process "is flexible and calls for such procedural protections as the particular situation demands." N.J. State Parole Bd. v. Byrne, 93 N.J. 192, 209, 460 A.2d 103 (1983). Consideration of the procedures required in a given set of circumstances "must begin with a determination of the precise nature of the [state action] involved as well as the private interest that has been affected by [the state] action." Id. [quoting Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972) (which quoted Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230, 1236 (1961))]. We are satisfied that the relevant public and private interests are fairly accommodated by a procedure which permits ETS to cancel scores upon an adequate showing of substantial question as to their validity, without any necessity for a showing of actual cheating or other misconduct.
The relevant interests here are several. Plaintiff has a legitimate interest in assuring that she is not stripped of a valid test score. ETS has an interest in assuring the accuracy of the test results it reports and the predictions it thereby makes. The other test-takers are entitled to assurance that no examinee enjoys an unfair advantage in scoring. The school officials to whom test results are certified need to be assured that all reported test results are reliable. Finally, the public at large has an interest in assuring that all persons certified as teachers have in fact fulfilled the requirements of that certification.
*619 Although those interests may at times compete or conflict, they express a common concern that ETS test scores be reliable. Indeed, plaintiff's effort to preserve her scores is bottomed on the proposition that they are presumptively reliable. But her argument that a finding of unreliability must be tied to proof of wrongdoing is faulty. Proof of wrongdoing is one way of establishing unreliability; but if unreliability is otherwise shown, an absence of proof as to how it came about is of no matter. Here ETS questioned plaintiff's scores on the basis of a statistical analysis showing hardly more than a 4 in 10 million chance that they were fairly earned. That gave ETS, and would give any other observer, substantial grounds for doubting the reliability of the scores. The fact that ETS had no proof of actual wrongdoing did not in any way undermine that showing of unreliability.
The procedural protection demanded by plaintiff is thus ill-suited to advance her legitimate interest in preserving a valid score. Affording that protection would in fact subvert the common concern to assure reliability of test scores, for it would require certification of demonstrably unreliable scores in the absence of proof of actual wrongdoing. ETS could no longer vouch for its test results, school authorities could not have confidence in them, other test-takers could no longer validate their qualifications and the public could have no assurance that teachers have the abilities purportedly shown by the scores. Due process does not demand a procedure having such little justification and such untoward consequence.
Although no reported decision has addressed the due process claim made here, several out-of-state cases have considered and rejected similar challenges. In Yaeger v. Educational Testing Serv., supra, 158 A.D.2d at 602, 551 N.Y.S.2d at 574, Yaeger brought suit to enjoin ETS from cancelling her NTE scores. ETS had found that Yaeger's answer sheet "bore suspicious similarities to that of another examinee" and that the increase in her scores over those achieved in her prior efforts "was statistically improbable", 158 A.D.2d at 603, 551 N.Y.S.2d at *620 576; ETS offered Yaeger the same options to resolve the dispute as in the present case. In affirming the grant of summary judgment to ETS, the Appellate Division held that "the clear public interest in reporting the valid test scores ... and the thorough efforts undertaken by ETS to ascertain the validity of the scores in this case" warranted the finding that ETS "acted in good faith" and in accordance with the procedures it had established. Id. at 604, 551 N.Y.S.2d at 576-577. The court also found "adequate evidence to support ETS'[s] determination to cancel [Yaeger's] scores on the ground of questionable validity" and held that the "numerous opportunities to validate the subject scores by providing relevant information, by being retested at no expense, or by selecting another option provided by ETS" gave Yaeger an adequate "opportunity to be heard." Id. at 605, 551 N.Y.S.2d at 577.
In support of its holding that ETS could properly cancel the scores "on the ground of questionable validity," the Yaeger court cited K.D. v. Educational Testing Serv., supra, 87 Misc.2d at 657, 386 N.Y.S.2d at 747. There ETS found doubt as to the authenticity of K.D.'s Law School Aptitude Test score based on a comparison of his answer sheets to those of another test-taker, as well as the discrepancy between his score and the scores he had obtained on earlier examinations; K.D. submitted to ETS only a sworn statement that he did not cheat on the examination. The Supreme Court found that the procedures fixed in the ETS documents could be construed as a contract of adhesion, but that the contract was fair and reasonable. The court's articulation of its reasoning is particularly apropos here:
To the extent that [ETS] can accurately predict the aptitude of a candidate for law school by means of its test results, it performs a highly valuable service not only to the law schools but to the public as well. Moreover, the accuracy of its predictions is [ETS's] sole stock in trade. The less accurate as a forecaster its tests are, the less value they have to the law schools. Thus, if [ETS] reasonably believed that the test scores of plaintiff as scored on the April, 1974 test, did not accurately reflect his aptitude for law school, it acted within its right to protect its own image as well as its obligation to the schools who are its clients in cancelling plaintiff's scores and requiring him to take a retest.
*621 Id. at 663, 386 N.Y.S.2d at 752. Other courts have reached like conclusions in similar cases. See, e.g., Johnson v. Educational Testing Serv., supra, 754 F.2d at 26; DePina v. Educational Testing Serv., 31 A.D.2d 744, 297 N.Y.S.2d 472 (1969). See also Langston v. ACT, supra, 890 F.2d at 386, which rejected a contention that proof of actual misconduct was required to justify cancellation of questionable scores:
To demand that ACT prove by eyewitness testimony that an individual cheated before invalidating a score would undermine ACT's primary function of providing colleges with scores that are highly reliable. ACT could not possibly catch every student who cheats on its exams if it had to produce an eye witness to confirm every instance of misconduct.
We find no contrary guidance in Martin v. Educational Testing Serv., Inc., supra, 179 N.J. Super. at 323-326, 431 A.2d 868, on which plaintiff relies. There Martin challenged the accuracy of his grade on ETS's Real Estate Licensing Examinations. The court found that Martin had "a substantive right to be tested fairly and accurately" and thus a right "to see that the examinations are graded properly and that the ETS grading key is correct." Id. at 326, 431 A.2d 868. Plaintiff here was afforded the remedy ordered in Martin, the opportunity to challenge the basis for ETS's action. Martin sheds no light on the question whether test scores can be cancelled without proof of misconduct.

IV
Plaintiff sought and obtained vacation of the arbitration award on the ground that, notwithstanding the terms of the submission, the arbitrator could not lawfully authorize cancellation of her scores without receiving proof and making a finding as to cheating. See N.J.S.A. 2A:24-8c, d. She did not and does not challenge the arbitrator's finding of "a substantial basis to question the validity of the scores." In light of our holding that ETS could lawfully cancel scores without proof of wrongdoing, we must conclude that vacating the award was error. The order is accordingly reversed. The matter is remanded to *622 the Chancery Division for entry of an order confirming the award and for further proceedings, consistent with this opinion, to dispose of the remaining causes of action pleaded in the complaint.