IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 98-30425
Summary Calendar

KERRY JOSEPH MURRAY,

Plaintiff-Appellant,

versus

EDUCATIONAL TESTING SERVICE,

Defendant-Appellee.

Appeal from the United States District Court for the
Middle District of Louisiana

April 6, 1999

Before GARWOOD, JONES and BARKSDALE, Circuit Judges.

GARWOOD, Circuit Judge:

This case involves a contractual dispute between plaintiff-appellant Kerry Murray (Murray) and defendant-appellee Educational Testing Service (ETS), the administrator of the Scholastic Aptitude Test (SAT). Based on the undisputed facts, the district court granted summary judgment in favor of ETS. We affirm.

**Facts and Proceedings Below**

ETS is a non-profit educational organization that administers the SAT I: Reasoning Test (SAT I). The SAT I is a multiple-choice

test designed to provide students and colleges with a uniform measure of verbal and mathematical reasoning abilities. Many colleges and universities require students to take the SAT I, and use the students' SAT I scores as a factor in determining college admissions.

The SAT I is divided into seven sections. Scores are reported on six sections, three verbal and three math. These scores are calculated to achieve separate verbal and math scores, which are then added together to create a combined, or total, score. The seventh "variable" section contains new questions that require pretesting before they can officially be used. Scores on the variable section are not reported. The variable sections vary among test books.

The ETS maintains procedures to ensure that test score are accurate and not the result of "testing irregularities or misconduct." The SAT I registration bulletin (bulletin), which all students must sign before taking the test, clearly states ETS's policy of reviewing irregular scores and explicitly reserves ETS's right to withhold any score which it has reason to believe was the result of misconduct.[1] The bulletin also outlines procedures which

---

[1]

"The College Board is obligated to report scores that accurately reflect your performance. For this reason, ETS maintains, on behalf of the College Board, test administration and test security standards designed to assure that all test takers are given the same opportunity to demonstrate their abilities and to prevent any student from gaining an unfair advantage over others

2

ETS follows in the case of a questionable score.[2]

ETS regularly reviews test takers' scores and compares those to any scores that test taker received on a previous SAT I test. When ETS finds a large score increase, it further examines the student's score sheet to determine whether misconduct may have occurred. ETS defines a large score increase as a 250-point increase in either the verbal or math section, or a 350-point total score increase.[3]

---

because of testing irregularities or misconduct. ETS routinely reviews irregularities and test scores believed to be earned under unusual or questionable circumstances.

ETS reserves the right to cancel any test score if there is an apparent discrepancy in photo identification, if the student engages in misconduct, if there is a testing irregularity, of if ETS believes there is a reason to question the score's validity."

[2]

"When the validity of a test score is questioned because it may have been obtained unfairly, ETS notifies the test taker of the reasons for questioning the score and gives the student an opportunity to provide additional information, to confirm the questioned score by taking the test again . . ., or to authorize ETS to cancel the score and receive a refund of all test fees.

In addition, the test taker can request third-party review of the matter by asking any score recipient to review the information and make its own decision about accepting a score that may be invalid or by asking that a member of the American Arbitration Association arbitrate ETS's action in accordance with ETS procedures established for this purpose . . . ."

[3] The highest possible combined score is 1600. In 1995, ETS conducted a statistical analysis of students who took the SAT as juniors in the spring of 1995 and again as seniors in the fall of 1995. On average, those students increased their scores by 14 points in both the verbal and math sections—for a total increase of

3

Murray was a student at McKinley Senior High School in Baton Rouge, Louisiana, who had been promised a basketball scholarship by the University of Texas-El Paso. In order to receive the scholarship, Murray was required to achieve a minimum combined score of 820 (on a scale of 200 to 1600) on the SAT I. Murray took the SAT I on March 26, 1996, and achieved a combined score of 700. Because he failed to achieve the required score of 820, Murray enrolled in "Testbusters," a four-week course designed to raise SAT I scores. On June 1, 1996, Murray retook the SAT I. This time, Murray achieved a combined score of 1300.

The large score difference between Murray's March 26 and June 1 exam caused ETS to closely examine Murray's scores. Following standard review procedure, ETS conducted a computer analysis comparing Murray's June 1, 1996, answer sheets to those of other students who took the SAT I at the same time and location. The analysis revealed an unusual correspondence between Murray's answer sheet and that of another test-taker (test-taker B). According to statistical analysis, the number of Murray's incorrect answers matching test-taker B's incorrect answers could be expected to occur only three times in comparing one hundred million pairs of answer sheets. ETS also conducted an "erasure analysis," which

_____

28 points. Only 0.4% of those students improved their scores by 150 points on either section. Of the 1,772 students scoring 700 (combined) on the spring 1995 test, only six received combined scores over 1,000 on the fall 1995 test. The highest of those scores was 1130.

4

showed a substantial number of erasure marks on Murray's answer sheet where answers apparently had been changed to match answers on test-taker B's answer sheet. Further, ETS compared Murray's answers on the variable section of the test to test-taker B's answers on the variable section. Although the respective variable sections of the two tests were different, Murray's responses to thirteen of the fifteen questions on that section matched test-taker B's responses. While test-taker B answered all fifteen questions correctly on the variable section, only three of Murray's responses were correct. Based on this information, ETS referred Murray's scores to a Board of Review for investigation. The Board of Review determined that ETS should continue to withhold Murray's scores. Upon further investigation, the Board of Review learned that test-taker B was seated diagonally in front of Murray during the test.

On August 22, 1996, ETS informed Murray that an investigation of his June 1996 scores revealed substantial evidence supporting cancellation of his scores. ETS informed Murray that, as described in the bulletin, Murray could provide ETS with information supporting the validity of his scores, retake the test, ask ETS to cancel the scores and obtain a refund, or request third-party review.

Murray provided ETS with a letter from his mother, academic records, and a letter stating that he had enrolled in the Testbusters course between the March 26 and June 1 test dates. On

September 20, 1996, ETS informed Murray that despite the additional evidence, the Board of Review still believed it had substantial evidence to warrant canceling Murray's scores. ETS informed Murray of his right to retake the test, cancel the scores and obtain a refund, or seek third party review.

Murray requested information about arbitration, but ultimately decided to take the test again. Murray took the SAT I again on November 8, 1996. His combined score was 800 (420 verbal and 380 math). On November 21, 1996, ETS informed Murray that the retest did not confirm the validity of his June 1, 1996, scores, and those scores would be canceled if Murray did nothing further.

ETS notified Murray of his remaining rights, including canceling the scores and obtaining a refund, asking any college, university, or agency to independently review his file, or arbitration. ETS also informed Murray of his right to seek judicial review. Murray filed suit in federal court, alleging that ETS breached its contract with Murray by failing to release the June 1, 1996, scores.[4]

## Discussion

This Court reviews a summary judgment *de novo*, applying the same standards as the district court. *Merritt-Campbell, Inc. v.*

---

[4] Murray also alleged a purported claim under 42 U.S.C. § 1983 for deprivation of his civil rights without due process of law. The district court dismissed that claim for lack of state action. Murray does not challenge that ruling on appeal.

*RXP Products, Inc*., 164 F.3d 957, 961 (5th Cir. 1999). Summary judgment is proper where the moving party demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2552 (1986), *quoting* Fed. R. Civ. P. 56(c). Once the moving party has identified material facts not in genuine dispute, the nonmovant must come forward with or identify in the record summary judgment evidence sufficient to sustain a finding in its favor respecting such of those facts as to which it bears the trial burden of proof. *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998).

No genuine issue of material fact exists as to whether ETS breached its contract with Murray. ETS's contract with Murray clearly and explicitly reserved to ETS the right to withhold any scores ETS had reason to believe were not valid. The only contractual duty ETS owed to Murray was to investigate the validity of Murray's scores in good faith. *See Pogo Producing Co. v. Shell Offshore Oil, Inc.*, 898 F.2d 1064, 1067 (5th Cir. 1990) ("Louisiana law imposes upon contracting parties the obligation to perform contracts in good faith.") (citing La. Civ. Code arts. 1759, 1983.). *See also Johnson v. Educational Testing Service*, 754 F.2d 20, 26 (1st Cir. 1985) (Massachusetts law requires ETS to investigate scores in good faith).

ETS fulfilled that duty by allowing Murray to present evidence

7

supporting his scores, informing Murray of his right to seek independent review, and ultimately allowing Murray to retake the test. *See Langston v. ACT*, 890 F.2d 380 (11th Cir. 1989) (testing agency fulfilled contractual duty by faithfully investigating questionable test score, allowing plaintiff to retake test, and offering to submit to arbitration); *Johnson*, 754 F.2d at 26 (consulting handwriting expert, providing plaintiff opportunity to be heard, and offering retest were evidence of good faith).

Several courts, including this one, have recognized the importance of allowing ETS to assure itself of the validity of students' scores through internal review procedures. ETS provides a valuable service to colleges and universities by providing a standardized measure of students' ability. *See, e.g., Crow v. Educational Testing Service*, Civ. No. 80-1865, 1982 U.S. Dist. LEXIS 18191 (W.D. La. 1982) (recognizing "the valuable service performed by ETS and its obligations and duties to the [schools] to accurately predict the aptitude of candidates."), *aff'd,* 703 F.2d 556 (5th Cir. 1983) (table); *K.D. v. Educational Testing Service*, 386 N.Y.2d 747, 752 (N.Y. Sup. Ct. 1976) ("To the extent that [ETS] can accurately predict the aptitude of a candidate . . . by means of its test results, it performs a highly valuable service not only to the [schools] but to the public as well."). Accordingly, ETS has an obligation to provide, or use its best efforts to provide, only valid scores to the colleges and universities that rely on

ETS's services. *Id.* Moreover, ETS has the right to protect its own reputation by assuring the reliability of the information it provides. *See, e.g., Scott v. Educational Testing Service*, 600 A.2d 500, 504 (N.J. Sup. Ct. App. Div. 1991) ("ETS has an interest in assuring the accuracy of the test results it reports and the predictions it thereby makes."); *K.D.*, 386 N.Y.2d at 752 ("[T]he accuracy of its predictions is defendant's sole stock in trade. The less accurate as a forecaster its tests are, the less value they have to the . . . schools. Thus, if defendant reasonably believed that the tests scores . . . did not accurately reflect [the plaintiff's] aptitude . . ., it acted within its right to protect its own image . . . in cancelling plaintiff's scores and requiring him to take a retest."). Finally, "[t]he other test-takers are entitled to assurance that no examinee enjoys an unfair advantage in scoring." *Scott*, 600 A.2d at 504. In this case, ETS dutifully fulfilled its contract with Murray by following established procedures for determining the validity of questionable scores. ETS provided the district court with substantial evidence regarding its reasons for questioning Murray's scores and the procedures it followed to determine whether Murray's score should be withheld. Moreover, ETS provided the district court with copies of its policies and procedures, as well as the testing agreement which every student must sign before taking the SAT I.

On appeal, Murray raises only mistaken claims of district

court confusion[5] and conclusory accusations of breach of contract. Murray has presented no summary judgment evidence disputing that ETS had grounds to doubt Murray's scores or that ETS failed to pursue Murray's case in good faith and, indeed, reasonably. As all of the aforementioned facts remain uncontested, there is no genuine dispute as to material facts. Summary judgment was properly granted and the judgment of the district court is

AFFIRMED.

---

[5] Murray accuses the lower court of "confusing the issues" and applying an improper standard of review by ruling on ETS's alternative motion to dismiss or for summary judgment. However, the district court explicitly stated that it was granting the motion on summary judgment grounds.

Murray also claims that the district court improperly considered the merits of the claim by noting that ETS had substantial reason to question Murray's scores. Here, the district court was merely noting that ETS had fulfilled its obligation under the contract. The court was not, as Murray suggests, offering an opinion as to whether Murray had actually cheated on the test. *See Crow v. Educational Testing Service*, Civ. No. 80-1865, 1982 U.S. Dist. LEXIS 18191 (W.D. La. 1982) ("The issue before this court is not whether or not [plaintiff] cheated on the test; the issue is whether or not ETS could refuse to release the score."), *aff'd* 703 F.2d 556 (5th Cir. 1983) (table).