908 A.2d 657

**Elba M. HILDEBRANT**

v.

**EDUCATIONAL TESTING SERVICE, et al.**

No. 221, Sept. Term, 2005.

Court of Special Appeals of Maryland.

Sept. 28, 2006.

24

Charles R. Claxton (Whitney A. Moore, on brief), Bethesda, for appellant.

Thomas P. Olson (Jonathan E. Neuchterlein, Wilmer Cutler Pickering, Hale and Dorr LLP, on brief), Washington, DC, David W. Lease, Smith, Lease & Goldstein, LLC, on brief, Rockville, for appellee.

Panel DAVIS, SALMON and ADKINS, JJ.

SALMON, J.

Educational Testing Service, Inc. ("ETS"), a non-profit corporation, develops, administers, and grades standardized tests. On September 11, 2004, one of ETS's standardized tests was administered to Elba H. Hildebrant ("Hildebrant") at Montgomery College in Rockville, Maryland. The test taken by Hildebrant was a Praxis Series School Leaders Licensure Assessment Test ("the Praxis test"). The Praxis test is a standardized licensing examination required to be taken by teachers in Montgomery County (and elsewhere) who hope to become school principals.

Hildebrant, a principal-intern at a Montgomery County elementary school, was among the candidates taking the test at Montgomery College. Dana Baker administered the test on behalf of ETS.

After the test was concluded, Ms. Baker submitted a "Supervisor's Irregularity Report" to ETS. The report said that Hildebrant, in Session I of the test, engaged in "misconduct" because she "refused to stop writing when time was called. Warning given. Material Taken." In regard to Session II, Ms. Baker reported that Hildebrant engaged in "misconduct" when she "had to be instructed twice to stop work and close the test book. (She insisted on completing her thought.)"

On September 30, 2004, ETS sent Hildebrant a letter telling her that it had been reported that she continued to work on a section of the test after time was called and that she failed to follow a direction to stop writing.

Hildebrant responded to ETS's letter with a missive dated October 9, 2004, in which she said that she was "willing to accept that the staff may think they were doing what they were instructed to do to maintain the secure, standard conditions" of the test center, but that she had "conformed completely to those standards, and that the report to the contrary was an error in judgment on the part of the proctor." Shortly thereafter, ETS canceled Hildebrant's test scores, based on its belief that Hildebrant engaged in the misconduct alleged in Ms. Baker's report. Subsequently, ETS returned to Hildebrant the fee she had paid to take the exam. ETS reported Hildebrant's (alleged) misconduct to no one.

Hildebrant filed a complaint and then an amended complaint in the Circuit Court for Montgomery County against Ms. Baker and ETS. The second count of the amended complaint was against ETS only and alleged that ETS breached its contract with plaintiff by failing to "fairly and accurately report her leadership assessment scores" to the Montgomery County Board of Education.

ETS filed a motion for summary judgment as to the breach of contract count. Hildebrant filed an opposition to that motion. After a hearing, the motions judge granted summary judgment in favor of ETS. The court then dismissed all remaining counts [1] against both Ms. Baker and ETS.

Hildebrant filed a motion to alter or amend judgment, arguing that summary judgment should not have been granted as to the breach of contract count because issues of material fact existed regarding whether ETS acted in good faith in determining that Hildebrant was guilty of misconduct. After ETS responded, the motion was denied on April 12, 2005. Hildebrant filed this timely appeal and raises one question, viz.:

Did the trial court err in entering summary judgment for ETS on appellant's breach of contract claim despite the

---

1. ETS had filed a motion to dismiss the other two counts in the complaint, which was granted. Hildebrant does not contend in this appeal that the court erred in dismissing the other counts.

presence of outstanding issues of material fact regarding whether ETS acted in good faith in determining that appellant engaged in misconduct?

## I. *STANDARD OF REVIEW*

■■■■ Summary judgment may be granted on the ground that "there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law." Md. Rule 2–501(a). In ruling on a summary judgment motion, the court must view all facts and all inferences that may be drawn legitimately from those facts, in the light most favorable to the party opposing the motion. Summary judgment should not be granted if the party opposing the motion can demonstrate that there is a genuine dispute as to material facts. *Ritter v. Ritter,* 114 Md.App. 99, 104, 689 A.2d 101 (1997). A fact is "material" if the outcome of the case depends on how the fact-finder resolves the disputed fact. *Id.* Thus, when reviewing the circuit court's grant of a motion for judgment, we determine whether a material fact is in dispute and whether the motions judge was legally correct in granting the motion. *Converge Services Group, LLC v. Curran,* 383 Md. 462, 476, 860 A.2d 871 (2004).

## II. *DEPOSITION EXCERPTS, AFFIDAVITS, AND EXHIBITS PRESENTED TO THE MOTIONS JUDGE*

### A. *Dana Baker's Deposition Testimony*

Dana Baker was deposed on December 21, 2004. She testified that she had worked for ETS for approximately eight years and that she administered roughly ten to fifteen tests per year for that organization. She further testified that she was "an associate supervisor of a testing site" and that she "generally [has] no knowledge of what ETS does after the testing session is over."

In regard to the test administered on September 11, 2004, the deponent said that Hildebrant continued to write after time had been called during the test, that a Supervisor's

Irregularity Report was filled out by her because of that infraction, and that she informed Hildebrant that such a report would be made.

## B. *Dana Baker's Affidavit*

Ms. Baker's affidavit read, in material part, as follows:

1. I am currently a Professor in and Department Chair of the Department of Counseling at Montgomery College, Rockville campus. I was chosen as one of twelve faculty members at the college to receive a Faculty Outstanding Service Award for 2003–2004.

2. I received a B.A. in psychology from The College of Wooster in 1981.

3. I received a M.A. in counseling and guidance from Trinity College in Washington, DC[,] in 1992.

4. I am currently pursuing a Ph.D. at American University in Washington, DC.

5. I have administered tests for Educational Testing Service ("ETS") and other testing companies for approximately ten years.

6. On behalf of ETS, I administered the September 11, 2004[,] The Praxis Series: Professional Assessments for Beginning Teachers, The School Leaders Licensure Assessment test ("Praxis test") at Montgomery College. Assisting me in my duties, which included monitoring the testing room, was a room proctor, Ms. Jocelyn Lowry.

7. One of the candidates who took the September 11, 2004[,] Praxis test that I administered at Montgomery College was Elba Hildebrant. I had never previously met Ms. Hildebrant, nor did I know anything about her before the test.

8. On September 11, 2004, I filled out a "Supervisor's Irregularity Report" regarding Ms. Hildebrant. I provided this report to the test site supervisor, who sent the report on to ETS.

## C. *The Registration Bulletin*

All candidates who take the Praxis test are sent a "Registration Bulletin" that spells out the rules governing the taking of the test. On the date Hildebrant took the test, she signed a certificate that read:

CERTIFICATION STATEMENT: (Please write the following statement below. DO NOT PRINT.)

*I hereby agree to the conditions set forth in the Registration Bulletin and certify that I am the person whose name and address appear on this answer sheet.

/s/ *I hereby agree to the conditions set [sic] in the Registration Bulletin an[d] certify that I am the person whose name and address appear on this answer sheet.*

SIGNATURE: /s/ *E. Hildebrant* DATE: /s/ *9/11/04*

Month Day Year

The Registration Bulletin advises test takers in advance about the consequences of breaking the test-taking rules. The Bulletin also alerts the test taker to the fact that ETS has the right to cancel a test taker's score if "misconduct" occurs. Misconduct is defined as directly observable violation of the rules during test administration, but the Bulletin also defines "misconduct" to include "working on any test, or test section, *when not authorized to do so,* or working after time has been called." Included in the Registration Bulletin are the following paragraphs:

ETS reserves the right to take all action—including, but not limited to, barring you from future testing and/or canceling your scores—for failure to comply with test administration regulations or the test administrator/supervisor's directions. If your scores are canceled, they will not be reported, and your fees will not be refunded.

*       *       *

### *Misconduct*

When ETS or test center personnel find that there is misconduct in connection with a test, the test taker may be dismissed from the test center, or ETS may decline to score

the test, or cancel the test score. Misconduct includes, but is not limited to, noncompliance with the "Test Center Procedures and Regulations," *pages 10–12* of this *Bulletin.*

### D. *Hildebrant's Affidavit*

Hildebrant's opposition affidavit read, in relevant part:

1. I am a principal intern at an elementary school in Montgomery County School System in Maryland ("MCPS"). One of the requirements to become a principal in MCPS is to take and pass the Praxis II, School Leaders Licensure Assessment test ("Assessment Test"), which is administered by ETS.

2. I registered by telephone with ETS to take the Assessment Test scheduled for September 11, 2004, for which I paid a fee of $465. . . .

3. I have read the Supervisor's Report of Irregularities, attached to the defendants' Motion to Dismiss or, Alternatively, for Summary Judgment as Exhibit 5. Each statement on the report concerning my conduct during the administration of the Assessment Test is false in every respect and has no basis in fact whatsoever. These statements are so contrary to any reasonable understanding or interpretation of anything that could have been observed that I have readily concluded that they were made with the knowledge that they were false and with the intent to harm me personally.

### III. *THE MOTIONS JUDGE'S OPINION*

The motions judge granted summary judgment in favor of ETS because (1) the contract between the parties (i.e., the Registration Bulletin) explicitly gave ETS the right to cancel the test scores whenever, in ETS's judgment, a test taker engages in misconduct; (2) ETS, pursuant to that right, exercised its judgment when it decided to cancel Hildebrant's score; (3) therefore, ETS did not breach its contract with the plaintiff when it exercised its judgment and canceled Hildebrant's scores.

## IV. *ANALYSIS*

■ In this appeal, Hildebrant does not take issue with the fact that ETS had the contractual right to cancel her scores if, in ETS's judgment, she had engaged in the conduct of which Ms. Baker accused her. Hildebrant argues, however, that ETS's exercise of its judgment in deciding whether to cancel the test scores must be exercised in good faith. According to Hildebrant, an issue of material fact existed as to whether ETS canceled the test scores in good faith. Her reasoning is as follows: (1) Hildebrant said in her affidavit that everything Ms. Baker said in the "Irregularity Report" concerning Hildebrant's failure to stop writing after time was called was false; (2) if what Ms. Baker said was false, then she knew it was false when she wrote the report; (3) Ms. Baker was, at all times here pertinent, ETS's agent; (4) ETS is bound by the knowledge of its agents; (5) because Ms. Baker knew the allegations of misconduct were bogus, then so did ETS; and (6) therefore, taking the evidence in the light most favorable to the movant, when ETS exercised its discretion to cancel the test scores, it did so in bad faith.

■ As Hildebrant correctly points out, in every contract there exists an implied covenant of good faith and fair dealing. *See, e.g., Food Fair Stores, Inc. v. Blumberg,* 234 Md. 521, 534, 200 A.2d 166 (1964) ("[I]n every contract there exists an implied covenant that each of the parties thereto will act in good faith and deal fairly with the others."); *First Union Nat'l Bank v. Steele Software Sys.,* 154 Md.App. 97, 139, 838 A.2d 404 (2003) ("Good faith is a standard that has honesty and fairness at its core and that is imposed on every party to a contract.").

In this appeal, ETS does not contest the fact that it was required to act in good faith when dealing with Hildebrant. ETS contends, however, that under applicable Maryland law, the knowledge of Ms. Baker cannot be imputed to it. ETS gives two reasons in support of that contention, which will be

discussed *infra.*[2]

In *Unsatisfied Claim and Judgment Fund Bd. v. Fortney,* 264 Md. 246, 255, 285 A.2d 641 (1972), the Court of Appeals said: " 'The ordinary law of principal and agent' is that knowledge of the agent is knowledge of the principal." (quoting *Boring v. Jungers,* 222 Md. 458, 463, 160 A.2d 780 (1960)). There are exceptions to that rule, however. One of the exceptions to the rule is the "adverse interest" exception. *See Hecht v. Resolution Trust Corp.,* 333 Md. 324, 346, 635 A.2d 394 (1994) (knowledge of agent whose interests are adverse to principal cannot be imputed to principal); *Shah v. HealthPlus, Inc.,* 116 Md.App. 327, 342, 696 A.2d 473 (1997) (same).

The RESTATEMENT (SECOND) OF AGENCY § 282 recognizes an exception to this exception. Section 282 reads, in material part, as follows:

Agent Acting Adversely to Principal

(1) A principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes, except as stated in Subsection (2).

(2) The principal is affected by the knowledge of an agent who acts adversely to the principal:

(a) if the failure of the agent to act upon or to reveal the information results in a violation of a contractual or relational duty of the principal to a person harmed thereby;....

Hildebrant relies upon the exception to the exception set forth in section 282(2)(a). She contends that the failure of Ms. Baker to reveal the falsity of her report resulted in a violation of a contractual duty that the principal (ETS) owed to her, which caused her harm. The exception to the exception set forth in section 282 of the RESTATEMENT (SECOND) OF AGENCY has been recognized, albeit impliedly, by the Maryland Court

---

2. In the facts section of ETS's brief, ETS asserts that Ms. Baker was an independent contractor as opposed to an agent of ETS. No similar assertion was made before the motions court by ETS and for good reason. There is simply nothing in the record to support that contention.

of Appeals. *See Louis K. Liggett Co. v. Rose,* 152 Md. 146, 163, 136 A. 651 (1927).

In *Liggett,* a landlord, one Diener, leased the same property to two tenants for portions of the same term. *Id.* at 150, 136 A. 651. The first lease was to Henry Rose and Emil Horowitz. *Id.* The second lease was to the Louis K. Liggett Company. *Id.* The central issue presented in the *Liggett* case was whether the Liggett Company had knowledge of the earlier lease when it signed the second lease. *Id.* It was proven at trial that a broker named Richards was employed by both the landlord and the Liggett Company in connection with the lease of the premises in question. *Id.* at 162, 136 A. 651. It was also proven that prior to the signing of the second lease Richards had seen the lease in which the landlord demised the subject premises to Messrs. Rose and Horowitz (the first parties to lease the premises). *Id.* at 163, 136 A. 651. Despite Richards' notice of the earlier lease, he did not communicate this knowledge to Liggett Company or to any of its agents. *Id.* at 163, 136 A. 651. The reason for the broker's nondisclosure evidently was greed, i.e., he stood to be paid a $10,000 commission if the second lease was signed and enforced. *Id.* at 162, 136 A. 651.

The Liggett Company contended, *inter alia,*

that brokerage fees to the amount of about $10,000 depended upon the success of the broker's efforts and that this made the interest [of Richards] adverse to the Liggett Company, so that even if [Richards] were its agent, the principal would not be charged with the knowledge of the agent acquired in the transaction.

*Id.* at 162, 136 A. 651. The Court of Appeals in *Liggett* rejected this contention, saying:

Richards had seen the agreement between Diener [landlord] and Rose and Horowitz, dated November 11, 1925, and knew its terms, but testimony is that he did not communicate this knowledge to Masters, the real estate agent of the Liggett Company, to Watt, its vice president or to anyone connected with the company. However lamentable this

silence in the discharge of his duty to his principal may be, *it would nevertheless be a repudiation of the fundamental principles of agency and of justice to entertain a proposition that such a non-disclosure by an agent would be the shield of the principal, while it encompassed the destruction of the contractual rights of a third party [Rose and Horowitz].*

*Id.* at 163, 136 A. 651 (emphasis added).

We agree with Hildebrant that the principles set forth in section 282 RESTATEMENT (SECOND) OF AGENCY, which were applied in *Liggett, supra,* prevents ETS from successfully arguing that the knowledge of Ms. Baker was not imputable to it.

ETS also argues that to impute Ms. Baker's knowledge to it contravenes the express contractual language set forth in the Registration Bulletin. According to ETS, the Registration Bulletin "could not be clearer" in this regard because the contract "(i) distinguished between ETS and its test center administrators and (ii) reserved for ETS alone, not any administrator, the sole 'judgment' concerning whether to cancel a test score for misconduct." In support of this argument, ETS relies on four sentences that appear in the Registration Bulletin:

- To promote these objectives [i.e., to report scores that accurately reflect the performance of every test taker], ETS reserves the right to cancel any test score when, in ETS's judgment, a testing irregularity occurs . . . .

- When ETS or test center find that there is misconduct in connection with a test, the test taker may be dismissed from the test center, or ETS may decline to score the test, or cancel the test score.

- When, in ETS's judgment, or the judgment of test center personnel, there is a discrepancy in a test taker's identification, the test taker may be dismissed from the test center.

- In addition [when there is a discrepancy in the test taker's identity], ETS may decline to score the test or cancel the test score.

As the Supreme Court said almost two hundred years ago in *Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 636, 4 L.Ed. 629 (1819), "[a] corporation is an artificial being, invisible, intangible and existing only in contemplation of law. . . ." And, as an "artificial being," a corporation can act only through its agents. This being so, it is impossible to see how the language used in ETS's contract proves ETS's point that the contract contemplates that even if the administrator of the test acts in bad faith such actions are not imputable to the corporation.

It is, of course, true that ofttimes ETS's judgment (as to whether the test taker has engaged in misconduct) is exercised by ETS agents other than test center administrators. For instance, if after the tests are scored, it comes to the attention of agents of ETS that the handwriting by the person who took a second test is different from that of the person who took an earlier test under the same name, the judgment as to whether there has been misconduct is made by someone other than "test center personnel." On the other hand, in certain situations, if misconduct occurs in the presence of test center personnel, test center personnel are empowered to dismiss the test taker from the test center without consulting with any other ETS agent.

The language relied on by ETS in this appeal, in our view, simply makes the obvious point that in many situations, agents of ETS other than test center administrators decide what is to be done about test taker misconduct. But nothing in the contractual language suggests that when making its corporate judgment, the knowledge of all ETS's agents (including the test center administrator) is not to be imputed to ETS.

Appellee also makes the following argument.

Appellant's "imputed bad faith" argument would drain all significance from ETS's contractual reservation of the right to use its "judgment." *Every* case of misconduct would be

subject to second-guessing and protracted litigation. Although ETS of necessity relies on thousands of test center personnel throughout the country, it would not be able to rely on eyewitness reports from any of them in deciding whether to cancel a score for misconduct, but would instead have to conduct its own independent investigation of each case and be exposed to the possibility of lengthy and costly litigation in every case. That would be a highly unfortunate result as a matter of public policy; but in any event, it is foreclosed by the plain language of the contract.

We disagree with the argument that if the knowledge of Ms. Baker were imputed to ETS then the result would be that the provision in the contract reserving to ETS the right to use its judgment would have no significance. Numerous cases have been decided in favor of ETS in which the court has enforced the contract provision at issue (i.e., the provision that ETS may exercise its judgment as to whether to cancel the test score) in situations where test site administrators have had no input. *See, e.g., In the Matter of K.D. v. Educ. Testing Serv.,* 87 Misc.2d 657, 386 N.Y.S.2d 747 (N.Y.Sup.Ct.) (1976) (ETS acted within its rights and within its obligation and duties in requesting that the plaintiff take a re-examination when it had good reason to believe, based on the large increase in score by the plaintiff in the second law school admission test ("LSAT") taken by plaintiff, coupled with striking similarities between plaintiff's answers and the answers of a person seated adjacent to him, that the score was not authentic); *Johnson v. Educ. Testing Serv.,* 754 F.2d 20 (1st Cir.1985) (ETS did not breach its contract by canceling plaintiff's LSAT scores when plaintiff's score increased by approximately three hundred points from the score achieved approximately four months earlier and when handwriting experts employed by ETS opined that the test had been taken by someone other than the plaintiff); *Murray v. Educ. Testing Serv.,* 170 F.3d 514 (1999) (ETS did not act in bad faith or breach its contract with student even though ETS canceled the student's score on an examination based on the fact that there was a huge increase in the test score when compared with student's prior test and

when the student's answers were strikingly similar to those of a nearby seatmate). Thus, it is not true that if the knowledge of agents, such as Ms. Baker, were imputable to ETS, then every case of perceived misconduct would be subject "to second-guessing and protracted litigation."

Moreover, ETS's cries of doom if courts were to impute to it the knowledge of the test taker administrator are greatly overblown. Although ETS has been involved in numerous cases resulting in reported appellate opinions, none of those opinions have involved a case like the subject one where the plaintiff alleges that the test taker administrator simply made up the allegations of misconduct. There is a good reason for this dearth of cases. Unless the test taker and the administrator were previously acquainted, it would be exceedingly difficult for any plaintiff to convince a fact-finder that a test site administrator would pick out some unfortunate test taker, invent a story demonstrating that the test taker had engaged in misconduct, and then report a false story of "misconduct" to others further up the ETS chain of command. Obviously, in order to succeed, a plaintiff in such a case would have to surmount a gigantic hurdle, unless the plaintiff could suggest some plausible motive for the administrator to lie. Absent cases where a motive to lie can be shown, it is difficult to believe that a test site administrator would act in such a fashion. Such dim prospects of victory in cases of this sort make it unlikely, in the extreme, that recognition that knowledge of the test site administrators is imputable to ETS would cause ETS to be inundated with similar lawsuits.

▆▆▆▆ Issues of credibility of witnesses are to be made by the jury and not by the judge who rules on a summary judgment motion. In this regard, we also stress what we said at the outset, i.e., in deciding whether summary judgment should be granted, all facts presented to the motions judge, together with all legitimate inferences that may be drawn from those facts, must be taken in the light most favorable to Hildebrant. Here there exists a material dispute of fact as to whether Ms. Baker made up her allegations of misconduct

against Hildebrant. If she did make up those allegations, her knowledge of the false allegation is imputable to ETS and that imputed knowledge would suffice to show bad faith on the part of ETS.

**SUMMARY JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY APPELLEE.**